Care, J.
The claim of the appellee being founded on the acts of assembly of 1825-6 and 1826-7, granting and releasing to him all the commonwealth’s right, title and interest, in the estate called Celeys, we are to inquire what were rights of the commonwealth, which those acts granted to the appellee and authorized him to assert by suit at law. or in equity? From the facts of the case, it is very clear, there could be no escheat, technically speaking; for the legal estate was vested in a citizen. But it is equally clear that this citizen was a mere trustee, holding the estate for the benefit of Philips the alien. It was a good deal discussed at the bar, whether this trust resulted, by operation of law, solely from the facts that the purchase money was paid by one, and the deed made to another, or was an express trust, raised by the agreement of the parties? Upon my mind, the evidence has left no doubt, that it was an express trust. The statute of frauds has no application to the case, even supposing the proof of the trust rests on parol evidence; as I think is clearly shewn by chancellor Kent, upon a full and very able review of the cases, in Boyd v. M'Lean, 1 Johns. Ch. Rep. 586. The declarations of Brodie, made at various times and on some solemn occasions, are full to prove, that he purchased and held this land for his friend Philips, and never.paid a cent or laid the slightest claim to it,.and that.he. said he would make the right, whenever any of the family could receive it. But I do not think it necessary to resort to parol evidence, to shew that there was an express agreement between the parties as to the trust. It is in clear proof, that there was a writing executed by Brodie to Philips, to secure Celeys. We are not, to be sure, made acquainted with the particular terms of this writing; nor. ought we (I apprehend) to be too strict in requiring this, when we reflect, how this paper has pro-v bably disappeared. Brodie was the representative of Philips, and the husband of his daughter, and in these characters, had a right to all his papers and documents. But, though the paper be lost,, the acts of the parties throw a *509 strong light upon its probable contents. Brodie held the legal title to guard it from escheat; Philips, and after him his son in law and daughter, enjoyed the full and free use and possession of the estate. The letters, too, of Brodie to old Mr. Goodwin and the appellee, shew, beyond a question to my mind, that he. considered himself holding Celeys for the appellee. I conclude on this point, that here was a clear express trust In Brodie for the benefit of Philips.
Now, we know that, in equity, the trust is the land ; the trustee, the mere instrument of conveyance, in no event to take a benefit. In Burgess v. Wheate, 1 W. Black. 161. lord Mansfield uses this strong language: “Twenty years ago, I imbibed this principle, that the trust is the estate at law in this court, and governed by the same rules in general, as all real property is, by imitation. Every thing 1 have heard, read or thought of since, has confirmed that principle in my mind.” It is, and has long been, I believe, the policy of most nations, to exclude from all participation in the soil, those who owe allegiance to a foreign government. It is a principle deeply rooted in the common law of England, which as to this, is our law. By it, an alien cannot hold land: he may take indeed by purchase, but it is only for the benefit of the king, and so soon as there is an office found, it is seized into the king’s hands; or if he die, the king is seized without office, for otherwise the freehold would be in abeyance, as an alien cannot have any inheritable blood; by act of law he can take nothing in land, for the law (which, as lord Hale says, nihil frustra facit) will not give him an inheritance or freehold, for he cannot keep it. The law, therefore, will not give an alien the benefit.of descent, curtesy, dower or guardianship. These positions are too well settled to need a reference to authorities. Would it not seem a strange inconsistency in the law, if principles so vital, so carefully guarded, might be rendered a dead letter by a mere change in the form of conveyances ? And yet this would be very much the case, if by making a citizen the trustee, the beneficial interest of the alien, in the *510 land, would be placed beyond the reach of the sovereign. Our country might be filled, our farms occupied, by strangers, owing no allegiance, feeling no attachment, to our go-vernment, and adding no strength to our resources; for both Persons> and ^ie wealth they might amass, would be withdrawn in the hour of danger. But the law is not justly chargeable with such inconsistency. In some of our oldest books, we find it laid down, that if an alien purchase land, and take a deed to J. S. in trust for himself and his heirs, the king shall have the land; not, indeed, by an inquest of office, but by a suit in equity. The first case we find on this subject, is that of The King v. Holland reported in several books. The case, as I gather it from the several reports of it, was thus : an alien purchased a coyyhold in fee, in the name of J. S. for himself and his heirs; and this being found by an office, the copyhold was seized into the hands of the king; J. S. came and traversed the trust, which was found for the king; yet the court decided, upon the peculiarity of the copyhold, being a base tenure, that the king could not recover the land itself, for that would make him tenant to the lord, to do service at his court, which the king could not be, but that he must sue in equity to have the trust executed. Lord Hale w'as of counsel in this case, and we see the account he gives of it, in the case of The Attorney General v. Sands, also reported by several hands. In Hardness, 495. he says, “ I hold that such a trust in an alien is forfeitable, and will belong to the king, as it was held in 23 Car. 1. in Holland's case: and the reason is, because, an alien has no capacity to purchase for the benefit of any other but the king. And it would otherwise be inconvenient, that aliens should receive the profits of lands to their own use; and the mischief would be the same as if aliens purchased the lands themselves.” Again, in a report of the same case, 3 Ch. Rep. 130. 133. it is said, that an alien, who is cestui que trust of any estate, such estate belongs to the king. And the chief baron said, that it was the opinion of the judges in Holland's case, in *511 which he was of counsel, that an alien hath no capacity to purchase, but for the king’s use. The same law is laid down in 2 Vin. Abr. 258. and in Bac. Abr. and Com. Dig. under the head of alien. In Gilbert on Uses and Trusts, 43. 243. it is also said, “ a trust in an alien, is forfeited to the king.” It is not necessary to cite more authorities; these are enough. I, at least, am well satisfied both with the authority and the reason of the cases. I conclude then, that the commonwealth had a right to recover this estate by bill in equity, resembling the escheat at law; and that having transferred this right to the appellee, the decree is correct in decreeing him the land; unless there be something in the case of the purchasers, which should protect them from the interference of equity. It was relied on that they were purchasers without notice; but the record contradicts this; it shews that both Parlcer and Hubbard had notice of the trust, before they were purchasers.
But I think no rents and profits ought to be given. Such is the settled doctrine in cases of escheat at law; and the reason given there, which I think a very good one, holds equally here.
Cabell and Brooke, J. concurred.
Tucker, P.
This case brings into question the rights and capacities of aliens.
An alien may take lands by purchase, but he cannot hold them, except for the benefit of the state. But although he can take by purchase, he cannot take by act of law, as by descent or curtesy; in other words, he cannot take by act of the law, but only by his own act; for the law will not cast the freehold upon him, merely that it may be forfeited. There is, moreover, no distinction herein, whether the purchase be by feoffment, bargain and sale, or other deed, or by devise. In all those cases, as the act of the party, and not the mere act of the law, casts the freehold on the alien, he can take; though he can only hold the estate he ac *512 quires, subject to the right of the state to seize it, at pleasure* This can only be done, however, by office found, or something equivalent thereto. For, it is one of the principies of the common law, that the crown can only take by matter 'of record; a principle established for the security of private property from the grasp of power. And until office found, or some equivalent proceeding, he may hold against all the world, not excepting the state, and is not accountáble for rents and profits previously received. 3 Wheat. 589. 11 Wheat. 332. These principles are so elementary in their character, that it is scarcely necessary to cite authority to prove them. I will refer, however, to 7 Cranch, 613. 618. where all the authorities have been diligently collected.
But though there seems to be no ground for difference of opinion, where the alien takes by purchase the legal title to •lands, yet there does not appear to be the same unity of sentiment, in relation to an equitable interest in lands acquired ¡by an alien.
That there are cases, in which the equitable interests of an alien in real property, are vested in the state, it will not be difficult to shew from reason and authority. But that wherever, in the case of a citizen, an equitable interest would be raised, it will be raised in favour of an alien, in order to forfeit it to the state, may, I think, well be questioned.
1. I am of opinion, that equity will never raise a resulting trust in favour of an alien. A resulting trust is the creature of equity. It is raised for the benefit of the party, who, upon principles of justice and the circumstances of the case, is entitled to the subject. Being raised for his benefit, there can be no motive for raising it, when that will pervert it to his prejudice. That which is designed as a boon, will not be changed into a forfeiture. To raise the trust, and thereby forfeit the estate, would be to commit the offence, and make the alien bear the penalty. Accordingly, although there is no case, perhaps, exactly like this; no case, where the court refused to raise a resulting trust for the alien, because *513 he had paid the purchase money; yet there are cases strongly analogous, in which the court has disclaimed the exercise of a like power, when it could only work a prejudice to the party. Thus in Redington v. Redington, 3 Ridg. P. C. 106. 184. where a father who was a papist, had purchased lands in the name of his son, and the question was, whether it should be considered as a trust for the father, or an advancement for the son, it was resolved to be the latter; and a principal ground taken by the chancellor was, that to imply a trust would forfeit the lands, at the very instant the trust should be raised. So in Commonwealth v. Martin’s ex’ors, in this court, where lands were devised to be sold, and the money paid over to aliens, it was argued, that, upon principles of equity, the devisees had a right to elect to take the land; but it was strongly said, “ Why shall equity do so vain a thing, as to convert an useful principle of equity as to cestuis que trust generally, into an engine of destruction as to alien cestuis que trusts, by supposing an election in them, which they are not permitted to exercise ?” “ The election given to a citizen, is adopted on the principle of extending a substantial benefit to him. Why will equity suppose this power in an alien, not as a benefit to him, but merely for the purpose of forfeiting bis estate.” 5 Munf. 127. See also Craig v. Leslie, 3 Wheat. 563. So too lord Mansfield, speaking of this right of election in the case of a papist, says, “ No: a roman catholic shall not make his election, because there is a law which says, that being a papist he shall not take land.” “ In common cases, where money is given to be laid out in land or securities, a common person may elect to take the land, a charity cannot; because it is unlawful; and, therefore, though the election be given, yet one alternative being lawful and the other not, a court of equity says you shall do that which is lawful.” Foone v. Blount, 2 Cowp. 467, 8. Pursuing these principles, and a like course of reasoning, I conclude that equity will never raise a mere resulting trust *514 for an alien, that it may be forfeited to the state : it will mot profess to benefit, when it designs to destroy.
2. I am of opinion, that, in the case of a mere executory contract for a purchase of land, while it yet remains in fieri, n0 forfeiture accrues. For until the purchase is complete by the execution of a conveyance, there is a locus penitentice, of which the parties may avail themselves. The act is not yet consummate, which the law has forbidden. If it should never be consummated, there would be no offence against this policy of the law. If the parties, by mutual consent, should rescind their contract, there could be no doubt of their right to do so, and then no forfeiture could ever accrue. If it were otherwise, then upon a contract to sell to an alien, even before a cent of the purchase money was paid, the land of the citizen would be forfeited, while no penalty would fall upon the alien.' But,
3. I am very clearly of opinion, that where for the purpose of evading the law, which prohibits an alien to hold lands, he purchases real estate in the name of a trustee, upon an express or secret trust to be permitted to take and receive the rents and profits, this is such a trust as in reason and upon the well received principles of equity, as well as upon authority, will pass to the state and be enforced at its instance and in its favour.
In reason, indeed, there can be no doubt. The inhibition of the law would be vain and nugatory, if it could be evaded by such a trust. The policy of that rule which denies to an alien the capacity to hold lands for'his own benefit, rests upon the ground, that it is unwise to permit the soil of the country to be in the hands of the subjects of a foreign power, and its revenues to be enjoyed by them; since the state must be impoverished by transporting the revenues of the land into foreign countries, and weakened by putting a part of its territory under subjection to a foreign prince. Now, in a trust of this description, every evil that can flow from the conveyance of the legal title, equally exists; and hence we shall find, that, for centuries past, it has been held *515 that the use of an alien shall go to the king. Had not this w principle been adopted, the courts must either have permitted the alien to enforce the trust, which would have been a direct infraction of the policy of the law; or they must have held the trustee entitled to the property for his own use, which would have been to hold out to him the wages of treachery.
The well received principles of equity concur in sustaining this position. Trusts are considered as the legal ownership, governed by the same rules, and liable to the same charges. The trustee is considered as merely the instrument of conveyance. He is treated as a mere machine used to effect a transfer to the cestui que trust, and is called a conduit, because without deriving any benefit himself, he serves merely to conduct the beneficial interest to another. The cestui que trust, on the other hand, is regarded as the real owner of the estate, and the declaration of the use or trust as the essential part of the instrument. Though courts of law look upon the clause, which binds the feoffee to permit the cestui que use to enjoy the land, as nothing, courts of equity look upon it, as every thing. How, then, is the policy of the law sustained, if the alien may be permitted to become the actual owner, the real beneficiary of the land? if, by this arrangement, he is permitted actually to hold and enjoy it as the ordinary landholder; to receive its rents, to use its resources, to spend them if he resides among us, in the acquisition of an influence which is deprecated by law, or if he resides abroad, to withdraw them to foreign lands, and, so far, to sap the foundations of our strength and diminish the wealth and prosperity of our people, by this worst of all kinds of absenteeism. I cannot think that such practices can be endured ;' for by such means, foreigners by selecting confidential friends as trustees, might ensure the actual enjoyment of the lands for a very long series of years, if not forever, in direct contravention of the policy of the law; (5 Munf. 140.) and that space in the land would be filled up by persons alien to our institutions, and the subjects *516 of foreign powers, which ought to be occupied by a faithful yeomanry devoted to the land of their birth or the country of their adoption.
Authority, upon this subject, is, I conceive, equally emphatical. I shall not stop to examine minutely, whether opinions, which have received the sanction of every luminary of the law, from the time of Coke and Roll to our own, were or were not expressed extrajudicial!y. To the opinion of the venerable sages of the law of ancient times, we are told that great veneration and respect are to be paid, “ as evidence that cases have formerly happened, in which such and such points were determined, which are now become settled and first principles.” They are among the fountains, from which we draw the common law; and when Coke or Roll or Hale lays down a principle as received, we may safely receive it as an adjudicated principle. If we consider only as dicta, and disregard accordingly, doctrines for which an express adjudication cannot be produced, the most unquestioned principles would be most in danger; for these are most apt to have their sources hidden, in the recesses of a remote antiquity. Confiding then, as I do, in the weight of the authorities, there can be no question, that they concur in establishing that a trust for an alien enures to the crown. Besides the short annunciation of this doctrine in the successive abridgements and elementary writers, to which reference has been made in the argument, I shall content myself with the mention particularly of the well reflected declaration of this opinion on the part of lord Hale as chief baron of the exchequer. In the case of The Duke of York v. Sir John Marsham, Hardr. 432. 436. he cites the case of The King v. Holland, in which he had been counsel. There, an alien had purchased a copyhold, which was conveyed to another in trust for him : and in assigning the reasons upon which, as he says, the right of the crown was declared not to be forfeited, there is no intimation of an idea, that it arose from the interest in the alien being merely equitable. On the contrary, the reasons assigned go as well *517 to deny the right of the king to a forfeiture of the copyhold itself, even if the alien had taken the legal title. In the following year but one, the case of The Attorney General v. Sands, which had been long under consideration was decided by lord Hale. Hardr. 495. Upon that occasion, the doctrine respecting a trust for an alien, was distinctly pressed upon the court in the argument; and his lordship, in delivering his opinion against the forfeiture in that case, distinctly admits, “ that the trust of an inheritance in an alien, is forfeitable, and will belong to the king; as, says he, it was held in Holland’s case; and the reason is, because an alien has no capacity to purchase for the benefit of any other but of the king. And it would be otherwise inconvenient, that aliens should receive the profits of lands to their own use, and, the mischief would he the same as if aliens purchased the lands themselves; but in that case the king is entitled to the profits only; the land itself is not forfeited to him.”
Here then, we have an explict opinion of lord Hale upon this point, not resting solely upon that in Holland’s case, but sustained by reasons suggested by his own accurate mind. We also have an explicit statement of the fact that such was the decision in Holland’s case. This statement was doubtless correct, for Hale was of counsel in the case, and his account of the judgement is far more satisfactory than the report in Stiles, in which there appears to me to be some omission, as the resolution of the court no where clearly appears. These decisions, more than 150 years ago, transmitted from generation to generation by the learned, as settled principles of the common law, cannot now with propriety be considered as mere dicta, which should have no influence with the court. As such this court did not consider them in The commonwealth v. Martin’s ex’ors; for there, the only debateable question was, whether the aliens were to be considered as having a trust in the lands; for it seems to have been agreed, on all hands, that, if they had, the right of the commonwealth was not debateable.
*518 The case of Burgess v. Wheate has been cited. Of this case, I think, it may be truly said, that it is of very doubtful authority. It was decided by lord JVorihington and sir Thomas Clarke against lord Mansfield’, decided as lord Thurlow says, 1 Bro. C. C. 204. upon divided opinions, and opinions, which continue to be divided, of very learned men.” And when we find lord Thurlow himself pronouncing, that it was decided " upon the scanty ground of the defect of a tenant,” and declaring an executor trustee of personalty for the crown for want of next of kin, we cannot err very far in placing him on the side of lord Mansfield in this matter. If we do so, the scales are balanced, and the opinions of other learned men will make that of lord Mansfield decidedly preponderate. See 2 Kent’s Comm. 54. citing Sugden’s Gilbert on uses, 86.404. That learned judge there delivers it as received doctrine, that the crown takes the trust of an alien. There, certainly, can be nothing more unreasonable, I think, than this decision of Burgess v. Wheate, if we consider it in any other light than as a mere question of tenure. That the trustee should be permitted, upon the death of the beneficial owner without heirs, to hold the estate to his own use, is utterly at variance, not only with the principles of equity, which consider him as a mere machine, an instrument, a conduit; which depjare-that trusts and legal estates shall be governed by the same rules, and that the trust shall descend and pass as the legal estate would descend and pass; but, it seems to me, at variance with the natural justice of the case. It is right and proper, that when the owner of property dies without giving it away, and without leaving any object having natural claims to his bounty, such as heirs or next of kin, his property should go to the community of which he is a member. But, in truth, Burgess v. Wheate was decided on the ground of tenure. It was a question of escheat for want of heirs, not of right in the crown because of alienage. And it was decided, that there could be no escheat upon the death of the cestui que trust without heirs, because the trustee was in existence *519 to do tho services. It is to me very obvious, that this principle has no application to the case of an alien. That is not (though it is often inaccurately so spoken of as) a case of escheat. The devolving of the rights of the alien on the crown, is arranged by the most distinguished commentator under the head of forfeiture; though, in a case of more recent date than his work, it is said that it is not to be considered as a penalty or forfeiture, but as arising merely from the policy of law; Attorney General v. Duplessis. Be this as it may, it is confessedly altogether distinct from es-cheat, of which no further evidence need be required, than that, in case of escheat, the property in England goes to the lord of whom the tenant held, whereas in case of alienation, to an alien, it always goes to the crown, even though the land be holden of a mesne lord. Now, though it be true, as decided in Burgess v. Wheate, that the interest of cestui que trust shall not escheat (that is, devolve upon the lord for want of a tenant) because the lord has in fact a tenant in the trustee ; yet it surely does not follow, that the trust estate of an alien, shall not devolve on the crown, for the same reason; since the want of a tenant is not the reason upon which it ever devolves on the crown. The case of Burgess v. Wheate has, therefore, I conceive, no application here.
After the preceding view of the state of the law which bears upon this case, I proceed to remark, very succinctly, upon the facts as they appear to me. J am clearly of opinion, that the doctrine of resulting trusts does not apply to the case. There is no room for a resulting trust where there is an express trust; and here, I think, there was an express trust, in writing, to permit the alien to take and enjoy the rents and profits to him and his heirs. That the land was purchased with Philips’s money is admitted : that Brodie always acknowledged that the property was not his but Philips’s is certain. From these circumstances, I should infer that, ah ovo, there was an understanding between Bro-die and Philips, that tho former was to purchase the land *520 in his own name, and hold it for the latter. Such an understanding was an express trust though verbal.
But it was not a mere verbal trust. It was a trust in writing. That there was a writing executed by the parties, is Perfec% clear; and this fact of itself puts the statute of frauds out of the question ; for, if the trust or bargain whatever it was, was reduced to writing, the statute cannot apply, even though the contract or writing be lost. What was the precise nature of that writing, we are not informed by the witnesses. They state, however, that it was a writing to secure the title of Celeys. It was executed in Philips’s lifetime, and the conduct of the parties amply supplies the defect of the testimony of the witnesses. Was it a bond to make a title ? Philips was an alien, and could not take one j else, the deed might have been made to him in the first instance. Was it a bond to make him a title when he should become a citizen ? If so, we should probably have heard of his taking some steps towards it. Nothing of that sort appears : no attempt at naturalization appears to have been made, though the facilities to admission had been, before 1805, the date of this transaction, very much increased.
These considerations shew, negatively, what was not the character of the written instrument. The acts of the parties shew pretty clearly, what was the character of the arrangement between the parties; and it would seem natural to suppose, that the writing contained the arrangement, whatever it might be. What was the arrangement ? I answer, that Brodie should continue to hold the estate in his own name, but should permit Philips to enter upon the estate, receive the rents and profits, enjoy it as his own, and have it completely under his control. .That this was the arrangement is to be presumed, because this was actually done. Philips did take possession; did enjoy, did receive rents and profits, did have complete control of the estate, and died in possession. After his death Goodwin and wife, both aliens, entered, in right of the wife, and held until his death, in the same manner. After Goodwin’s death, Mrs. Good *521 win, still an alien, continued to bold in the same manner, until she married Brodic in lbll ; and alter tue marriage, Jirodie and herself resided on the property until 183 5, when she died. What are we to infer from these facts, but that, although the land was held in Brodie’s name, it was arranged between him and his friend, that that friend, though an alien, should be permitted to hold, enjoy, and control the estate as his own, under the shadow and protection of the deed from Cary to Brodie. A more complete trust cannot, 1 think, be conceived, and the right of the commonwealth is a necessary consequence. This right might properly have been asserted in the court of chancery, even in Philips’s lifetime ; but since, by his death, the title was devolved on the state, without an office found, there can no longer be a question as to that matter. Moreover, the right of the commonwealth is transferred to the appellee, and be is empowered to assert it in any court of law or equity.
Having thus arrived at the conclusion, that the commonwealth bad the right, and that the plaintiff is invested with that right, we next proceed to the defences.
Neither Parker nor Hubbard were purchasers without notice of the trust. If they had so purchased, they would not have been affected by the trust. Yet they must have shewn payment of purchase money, and the receipt of the conveyance to protect them. But, in truth, it is clearly proved they had both sufficient notice, not only before one cent of the money was ever paid, but before Hubbard even became the purchaser.
It was said, this sale was authorized by the guardian and counsel of the appellee. No such authority could have been given by him, for he was an infaut; and it was not, therefore, possessed by the parties who exerted it. in fact, at that time, the commonwealth, and not Goodwin, was the party interested.
As to the profits : The commonwealth (or Goodwin who stands in her stead) can come into equity only upon the principle, equitas sequitur legem. They rely that trusts *522 must be treated as legal estates, and upon that ground assert ^le r‘gl-lts of the state. If so, then the principle must be followed up to its consequences. We cannot blow both h°t and cold. If equity follows the law, it must follow it throughout. Now? at law, until office found, the alien may receive the rents and profits and shall never be accountable for them. 3 Wheat. 563. 589. And this is the consequence, I take, it, of the fact, that there is no remedy for such profits. In Wheaton, no case is cited in support of the position ; but it seems sufficiently obvious upon this ground simply. The office found merely ascertained title of the crown, whereupon it entered by its officers. But no damages were provided for, nor were damages ever found by the inquest, nor is any remedy devised for the recovery of them. And this was equally the case, whether the alien himself or any other took the profits. Upon office found, they could not be recovered. Now, equity in following the law, cannot go further than the law. Equity, therefore, cannot decree rents and profits. The alien or any other person may take them without accountability, until office found or until some équivalent proceeding. What is the equivalent proceeding in this court ? The decree. The office found ascertains the title of the crown, and vests the possession. That is the effect here of a decree, and until the decree there is no such effect. Therefore, I am of opinion, that so much of the decree of the court of chancery as decrees a title to be made to the appellant be affirmed, and, as to all other matters, that it be reversed.
I am clearly of opinion, that the court ought not in this cause to undertake to adjust the transactions between Hub-hard and Kennedy. None of the cases in which the court has decreed between defendants, have gone so far. I think it has been done in no case where the plaintiff was not entitled to a decree against both or either. The practice should not be extended further. The contest, if any, between defendants can never come fairly before the court. There is no issue made up, nor any provision for taking *523 their testimony in reference to the peculiar matters in difJ . ference between them. Indeed, it does not follow, that in answer to a plaintiff’s bill, the defendant should go on to state his own case in reference to his difference with his co-defendant.
However, as the appellants were both properly made parties in the court of chancery, in reference to the question of title, they must pay the costs of that court. They must have their costs here.
Both decrees reversed, so far as they directed an account of profits, and decreed the payment of the profits by Kennedy and JYimmo’s administratrix, and the first decree, for the land itself, affirmed.